UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITES STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Cause No.: 4:25-cr-00451-HEA-1 |
| vs. ) | |
| ) | |
| GARY GRAJALES-REYES, ) | |
| ) | |
| Defendant. ) | |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Gary Grajales-Reyes ("Grajales"), through undersigned counsel, and hereby submits the following memorandum for sentencing:

**I.    Background**

On August 27, 2025, Grajales waived indictment and pled guilty to a three-count Information, charging Wire Fraud in violation of 18 U.S.C. §1343. [Doc. Text #4]; *see* Presentence Report ("PSR") at ¶ 1. The plea agreement entered by Grajales reserved the right to argue that an additional 2 level decrease should apply under USSG §4C1.1. Guilty Plea ¶ 6(b)(2)(iv). Thus, Grajales disputes the PSR Total Offense Level 18 and instead argues it should be 16. PSR ¶ 38.

Based upon a Total Offense Level of 16 and a Criminal History Category I, the guideline imprisonment range would be 21 to 27 months. USSG Sentencing Table Ch.5 Pt. A. This guideline range still falls within Zone D of the Sentencing Table, therefore under USSG §5B1.1 Grajales would be ineligible for probation. However, for the reasons detailed in this memorandum, Grajales respectfully suggests that a sentence of probation would best serve the statutory purposes of sentencing. Alternatively, Grajales recognizes the Court may deem probation inappropriate, and would seek a 21-month sentence, rather than 27 to 33 months as argued by the Government.

**II.     USSG § 4C1.1 Adjustment for Certain Zero Point Offender Should Apply**

The Government's argues that the two-level decrease under USSG § 4C1.1 should not apply to Grajales because he caused "substantial financial hardship" to the victim in perpetrating his crimes. Guilty Plea ¶ 6(b)(2)(iv). The Government would concede Grajales meets the ten other requirements laid out for this adjustment under USSG § 4C1.1. Thus, only "substantial financial hardship" is at issue. Under "Definitions and Additional Considerations," the Guideline directs the Court to consider among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the commentary to USSG § 2B1.1. USSG § 4C1.1(b)(3).

The factors listed in subsection (F) of Application Note 4 USSG §2B1.1 are whether the victim: (i) became insolvent; (ii) filed for bankruptcy under the Bankruptcy Code; (iii) suffered substantial loss of a retirement, education, or other savings or investment fund; (iv) made substantial changes to his or her employment, such as postponing his or her retirement plans; (v) made substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffered substantial harm to his or her ability to obtain credit.

The loss amount at issue here is indisputable substantial, totaling nearly half a million dollars. And the guidelines clearly account for this, which is why there is a 12-level increase under USSG § 2B1.1. PSR ¶ 30. The guidelines also attempt to show some leniency to zero-point offenders by allowing a 2-level decrease if the eleven criteria laid out in USSG § 4C1.1 are met. The factors given by the Guidelines in determining if "substantial financial hardship" has occurred as a result all contemplate the financial position of the victim after the crime. A high total loss amount is not contemplated once. Because it is irrelevant to this inquiry. Instead, this inquiry deals entirely with the impact the financial loss had on the victim.

While a loss amount of this magnitude would leave many individuals and institutions in a place of sincere "substantial financial hardship," it simply does not do so to an institution like Washington University. According to their own website, Washington University's Endowment sat at $12,000,000,000.00 as of June 30, 2024.[1] With that number in mind, the total loss amount in this case of $412,163.54 represents just .0034% of the institution's endowment. Defense counsel would humbly submit that these offenses have not caused Washington University "substantial financial hardship" as defined in the guidelines. Thus, Grajales should receive the benefit of the additional 2-level decrease authorized under USSG § 4C1.1, and a Total Offense Level of 16.

While this Total Offense Level would still compute an appropriate outcome as a sentence of imprisonment between 21 and 27 months, Grajales respectfully suggests that a below guidelines sentence is appropriate in this case, and requests that he be sentenced to probation.

### III.   Sentencing Rules

Title 18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. There are four purposes of sentencing[2] and six factors to consider in connection with them.[3] The guidelines are only one factor to consider

---

[1] Investment Management Company (WashU IMC). *See Endowment Facts* (June 2024), available at https://endowment.wustl.edu/about/endowment/

[2] The purposes of sentencing are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2)(A)-(D).

[3] The factors to consider in connection with the purposes of sentencing are:

    (A) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (B) the kinds of sentences available;
    (C) the guidelines promulgated by the Sentencing Commission;
    (D) any pertinent policy statement issued by the Sentencing Commission;
    (E) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and
    (F) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1)-(7).

3

and deserve no greater weight than any other factor. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

### IV.    Grajales's History and Characteristics

Gary Emanuel Grajales-Reyes was born December 16, 1988, in San Juan, Puerto Rico. PSR ¶ 46. He reported a good childhood, free of abuse and neglect, where all his basic needs were met. *Id.* He was raised by his father, Edgardo, and mother, Damaris, in a loving home. *Id.* His mother's background in special education, and his father's love of science as a pharmacist led Grajales to pursue academics from an early age. *Id.* The emphasis Grajales' parents placed on education paid off. Both Gary, and his brother Jose, eventually went on to earn M.D.'s from prestigious American Universities.

Gary's brother Jose has written a letter in support that defense counsel has filed as an exhibit, wherein he lays out the helpful guidance Gary gave him in his own educational journey. Gary was able to obtain a PhD in research medicine in addition to his M.D. in an eight-year dual degree program at Washington University. Clearly this immense accomplishment was the result of decades of academic work on the part of Grajales, but for the sake of efficiency, counsel has simply attached Grajales' 9-page resume as an Exhibit for the Court's convenience.

While Grajales was beginning his clinical residency in 2018, he met Laura Fisher, whom eventually became his life partner. PSR ¶ 47. When they met online, Ms. Fisher lived in Texas. In the intervening years a romantic relationship formed, but it was a long-distance relationship with Ms. Fisher maintaining a residence in Texas while Grajales stayed in St. Louis and completed his studies.

In 2022, the couple was elated to find out they were expecting a child, and in October of 2022, their son Lucas was born. However, when Lucas was born, there were complications and it

4

became apparent that Laura had been using drugs, in particular methamphetamine during her pregnancy. Grajales was unaware as they still lived in different States. An investigation was launched in Texas, and no wrongdoing was found on Grajales's part. But this meant Grajales was Lucas's sole caretaker in the first couple months of his life. Eventually, in 2024, Ms. Fisher to move to St. Louis to live with Grajales, in a more stable environment to address her addictions.

To this day, Laura still has some struggles with mental health and addiction issues, and thus the couple has made the responsible decision to have Lucas raised by his grandparents in Puerto Rico, while Laura continues to work on these issues. This does not mean Grajales is an absentee father. He reports calling his son Lucas daily and making visits almost monthly. While he misses his son dearly, and looks forward to raising him again, he recognizes Lucas is best served living with his grandparents for the time being and has put Lucas's needs above his own desires.

This background is important for the Court to consider in understanding how Grajales got himself into such a precarious financial situation. And while it does not at all absolve his crimes, it contextualizes Grajales' financial struggles. This is supported by the third Exhibit defense counsel has submitted with this memorandum; a letter written by Ms. Fishers' parents Steven and Vicki Fischer.

### V. Defendant Grajales Poses a Reduced Risk of Recidivism

United States Sentencing Commission data supports the conclusion that Grajales poses a reduced risk of recidivism, as compared with other offenders, and suggests that a sentence variance that minimizes any sentence of incarceration is appropriate in this case. *See e.g.,* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 16 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (hereinafter

"Measuring Recidivism"). The criminal history measure of the guidelines estimates the likelihood of recidivism based on two offender characteristics: prior convictions and prior terms of incarceration. *See* U.S.S.G. §4A1.1 The United States Sentencing Commission's 15-year report, however, concludes that the measure's predictive power would improve if it incorporated additional offender characteristics. *See Measuring Recidivism* at 16.

Educational attainment correlates with lower recidivism rates. *See Measuring Recidivism* at 12, 29. Criminal history category I offenders who have not graduated from high school recidivate at a rate of 21.3%. *Id.* at 29. Those who have some college recidivate at a rate of 13.9%. *Id.* And offenders with college degrees at just 8.8%. *Id.* Grajales has obtained post-graduate degrees, and thus data supports a lower risk of recidivism. PSR ¶ 58.

Additional United States Sentencing Commission data supports the conclusion that, as a first offender with no prior contacts with the criminal justice system, Defendant Grajales poses a further reduced risk of recidivism, as compared with other category I offenders, suggesting that a sentencing variance that minimizes Simaku's potential sentence of incarceration is appropriate in this case. *See e.g.*, U.S. Sentencing Comm'n, *Recidivism And The "First Offender"* (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter "*First Offender Report*"); *United States v. Tomko*, 562 F.3d 558, 571 (3d Cir. 2009) (upholding a sentence of one year home detention, restitution, community service, and a fine for tax evasion instead of the Guideline's 12-18-month sentence recommendation because of the defendant's negligible criminal history, employment record, community ties, and extensive charitable works).

The Guidelines deem "first offenders" generally less culpable and less likely to re-offend than all other offenders. *See First Offender Report* at 1. The Guidelines broadly define "first

6

offenders" as offenders who have no prior convictions or incarcerations. *Id.*; *see also* U.S.S.G. § 4A1.1; *see also* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 24 (2003). The Commission has recognized, however, that consideration of additional factors will better identify those first offenders who prove *least* culpable, *least* likely to re-offend, and therefore *most deserving* of the leniency recommended by 18 U.S.C. § 994(j); *First Offender Report* at 1. In an ongoing effort to do so, the Commission divided "first offenders" with no criminal history points into three categories: those with (A) no prior arrests, (B) prior arrests but no prior convictions, or (C) prior convictions counted under U.S.S.G. § 4A1.2(c)(2) only. *Id.* at 5. It then collected and analyzed data about the characteristics of offenders in each of the three categories. *See id.* It concluded that:

> From both culpability and recidivism risk perspectives, group A offenders, with no prior arrests, most strongly meet the conceptual definition of the first offender category. Offenders in group A have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate, 6.8%, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

*Id.* at 17.

The Commission noted it was important that "the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).

Defendant Grajales has no history of an arrest prior to commission of the instant offense, so he falls within group A—first offenders who are least likely to reoffend. PSR at ¶ 92. These factors indicate that Grajales poses a low risk of recidivism and, as such, is a good candidate to

7

receive a sentence of probation, as a sentence of incarceration is not necessary to achieve the purposes of sentencing.

## VI. The Nature of the Offense

Defendant Grajales pled guilty to three counts of Wire Fraud. PSR ¶ 1. Between January 2024, and May 2025, Grajales bought hard drives under false auspices of using them in Washington University's research lab, with university funds, and instead sold these hard drives for personal profit. There were no other actors involved in this scheme. Defendant Grajales regrets his role in the scheme and intends to pay his restitution debt over the course of his life.

## VII. Defendant's Ability to Begin Paying Restitution

However, with candor to the Court, and as is obvious from Grajales' financial disclosure, paying this restitution amount will likely take the Defendant a long time. Grajales currently has a negative net worth and negative monthly cash flow. PSR ¶ 71. Grajales was terminated from Washington University when charged here. Since that time, he has not sat idly by and awaited resolution before re-entering the job market. Instead, he has found what work was available in the form of driving for Uber and other ride-share services.

This income does not begin to cover his bills to be blunt. But, his willingness to get employment of any variety to continue attempting to pay down his debts does speak to Grajales' character. Additionally, Grajales is hopeful that in the future he will be able to return to some sort of employment in the scientific field. He has not yet attempted to re-enter the field, as he is awaiting resolution of this matter prior to doing so. He has shared with his counsel an earnest desire to seek out work in the medical, rather than research field in the future. And his resume supports this idea, that he will likely still be employable in such a field, despite these convictions. While it is clearly

8

unlikely that Grajales will ever be put into the same position, with powers of purse over a research project, his uniquely scientific mind is not one that will likely be cast aside by society as a whole.

As the PSR notes, Grajales' name is attached to a patent on "Compositions and Methods for Treating Neurodegenerative diseases." PSR ¶ 70. According to Grajales, this is a patent on research that showed promising signs for treatment of Alzheimer's and dementia in transgenetic mice studies. This is just another indicator of the unique mind Grajales possesses. A mind that took decades to hone and form. A mind that will still be available for societies' benefit, and the sooner the better. Given Grajales' unique talents in the scientific field, he has a unique opportunity to find gainful employment that could eventually allow him to pay down the debts he has accrued in this scheme. But any period of incarceration will only make such opportunities less likely.

### VIII. Conclusion

For the foregoing reasons, Defendant Grajales respectfully suggests that a sentence of probation, will best serve the statutory purposes of sentencing. Alternatively, Defendant would respectfully request the Court sentence him to 21 months imprisonment should probation be deemed inappropriate.

Respectfully Submitted,

ROSENBLUM, SCHWARTZ, FRY & JOHNSON, PC

By: /s/ *Isaac E. Dodd III*
ISAAC E. DODD III, #74042
Attorney for Defendant
120 S. Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332/Facsimile (314)862-8050
idodd@rsfjlaw.com

**CERTIFICATE OF SERVICE**

By signature below, I hereby certify that on November 26, 2025, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Assistant United States Attorney Hal Goldsmith.